IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                          No. 24-cr-01819-KWR

MARIO GONSALEZ, JR.,
GUILLERMO GARCIA, JR., and
CRUZ ZERMENO,

        Defendants.

### ORDER AND OPINION DENYING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE OBTAINED DURING THE TRAFFIC STOP

THIS MATTER comes before the Court on Defendants Cruz Zermeno's, Mario Gonsalez, Jr.'s, and Guillermo Garcia, Jr.'s, motions to suppress evidence seized during a traffic stop that occurred on November 20, 2024. Doc. 70 (Defendant Cruz Zermeno); Doc. 71 (Defendant Mario Gonsalez, Jr.); Doc. 72 (Defendant Guillermo Garcia, Jr.). The Court concludes that Defendants' motions are not well taken, and therefore, are **DENIED**.

### BACKGROUND

On November 20, 2024, Task Force Officer Juan Rodriguez ("TFO Rodriguez") stopped a black Acura on Interstate 40 for driving unreasonably close behind a trailer truck, a violation of N.M. Stat. Ann. § 66-7-318(A). Ex. 1, 0:00–0:30, 1:25 (dashboard camera); Ex. C (traffic citation); Doc. 102, 13:25–14:3, 15:23–18:20 (motion to suppress hearing transcript).

After conducting a traffic stop, TFO Rodriguez exited his vehicle and approached the Acura; as he approached, TFO Rodriguez observed movement in the backseat. Doc. 102, 20:15–21:4. Because of this movement and the dark tint on the vehicle's windows, TFO Rodriguez asked

1

the passengers to roll down the back windows. Ex. 2, 0:17 (lapel camera); Doc. 102, 22:10–22:18. Once the windows were rolled down, TFO Rodriguez smelled marijuana emanating from inside the vehicle. Doc. 102, 23:17–23:20. TFO Rodriguez asked for the driver's license and registration and identified the driver of the vehicle as Mario Gonsalez, and eventually identified the front passenger as Guillermo Garcia and the backseat passenger as Cruz Zermeno. Ex. 2, 0:17–0:40.

TFO Rodriguez then asked Gonsalez to exit the vehicle and come to his patrol vehicle while he completed the traffic stop citation. Ex. 2, 0:50. While filling out the warning, Gonsalez agreed to speak with TFO Rodriguez. Ex. 2, 2:30–2:35. In response to a question about his travel plans, Gonsalez stated that he was driving from California to Mission, Texas, to visit his father and that he intended to stay there until December 2. Ex. 2, 3:00–3:20. TFO Rodriguez also learned that Gonsalez had a revoked driver's license. Ex. 2, at 1:50. He then exited the patrol car to inspect the VIN of the vehicle against the paperwork provided. Ex. 2, 5:00. TFO Rodriguez was filling out paperwork for this entire exchange. Ex. 2, 1:30–5:00.

As TFO Rodriguez approached the car and before he inspected the dashboard VIN, he asked the passengers whether he could talk to them while checking the VINs. Ex. 2, 5:20. TFO Rodriguez inspected both the dashboard and doorjamb VINs during his interaction with the passengers. Ex. 2, 5:28–6:25. In response to TFO Rodriguez's question about their travel plans, Garcia stated that they were travelling to visit Gonsalez's ailing father. Ex. 2, 5:35. Garcia also stated that there were going to Mission, New Mexico (not Texas), and that they did not know when they would return. Ex. 2, 5:47–5:55.

After confirming that the VINs on the vehicle matched Gonsalez's paperwork, TFO Rodriguez returned to the patrol vehicle and again asked Gonsalez to join him inside. Ex. 2, 6:36–6:45. TFO Rodriguez continued to work on completing the written warning. Ex. 2, 6:46–9:15.

2

While printing the warning, TFO Rodriguez asked Gonsalez about his father and whether he was in good health; Gonzales responded that his father was a truck driver and was "doing pretty good for himself," and noted that he had a pacemaker for an undisclosed heart issue. Ex. 2, 7:40–8:04. Gonzalez then signed the paperwork, and after handing Gonsalez the written warning, TFO Rodriguez confirmed that he returned Gonsalez's paperwork and documents. Ex. 2, 9:15–9:20. TFO Rodriguez then asked Gonsalez if he had any additional questions, and in response, Gonsalez asked about how closely he was allowed to drive behind other vehicles; TFO Rodriguez explained that, when travelling at interstate speed, he should maintain at least seven car lengths or around 70 feet. Ex. 2, 9:20–9:40. TFO Rodriguez later testified that he believed maintaining at least three car lengths is reasonable and prudent under like circumstances. Doc. 102, 17:2–18:20.

TFO Rodriguez then asked Gonsalez if he would be willing to answer additional questions about his travel, to which Gonsalez agreed. Ex. 2, 9:51. As Gonsalez spoke about his travel plans, TFO Rodriguez mapped the route and questioned Gonsalez about why he avoided taking I-10, noting that their current route on I-40 was much longer. Ex. 2, 10:53–11:00. TFO Rodriguez then asked whether there was anything illegal in the car, which Gonsales responded to in the negative; however, Gonsalez admitted to having a "little bit of marijuana" in the car. Ex. 2, 11:20–11:40.

TFO Rodriguez then asked for Gonsalez's consent to search the vehicle. Ex. 2, 11:45. Gonsalez refused. Ex. 2, 11:45–11:50. TFO Rodriguez then stated that he was going to search the car nonetheless and explained that marijuana is a controlled substance under federal law. Ex. 2, 11:45–12:10. TFO Rodriguez asked whether Gonsalez had luggage in the car, which Gonsalez affirmed and stated that it was in the trunk. Ex. 2, 12:20–12:30.

TFO Rodriguez returned to the Acura to remove and secure the passengers prior to the search. Ex. 2, 12:58. Zermeno, when asked about his travel plans, stated that he thought they were

3

going to New Mexico, did not know when they were going to return, and had no luggage. Ex. 2, 16:15–16:47. At the same time, another officer at the scene stated that he could see marijuana in plain view in the backset of the car. Ex. 2, 17:13.

After the passengers were removed from the vehicle, TFO Rodriguez started his search by opening the trunk. Ex. 2, 18:25. Within a few seconds of opening the trunk, TFO Rodriguez observed a plastic garbage bag with "bulges like a square," and after tearing it open, he discovered a substantial quantity (approximately 25 pounds) of methamphetamine. Ex. 2, 18:25–18:50; Doc. 102, 42:23–43:3, 45:1–45:4. TFO Rodriguez thereafter arrested the driver and passengers.

## DISCUSSION

The Court must decide whether the traffic stop, the warrantless search, or the arrest of the vehicle's passengers violated the Fourth Amendment. The Court concludes that TFO Rodriguez did not violate the Fourth Amendment for the duration of the encounter, and therefore, Defendants' motions to suppress evidence must be denied.

I.  **The traffic stop was justified at its inception and remained lawful for its duration**.

The traffic stop did not violate the Fourth Amendment. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment." *United States v. Dawson*, 90 F.4th 1286, 1290 (10th Cir. 2024) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A traffic stop is reasonable if it is (1) "justified at its inception" and (2) remains "reasonably related in scope to 'the mission of the stop itself.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (citing *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017)

4

(quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015))). The Court concludes that the traffic stop was reasonable under the circumstances.

  A. <u>The traffic stop was justified at its inception</u>.

  The traffic stop was justified at its inception. "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009); *see also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."). "Once [an officer] observe[s] [a driver] commit a traffic violation, he [has] reasonable suspicion to stop [the driver's] car." *United States v. Parker*, 72 F.3d 1444, 1449 (10th Cir. 1995) (citation omitted). "It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.'" *Botero-Ospina*, 71 F.3d at 787 (citation omitted). "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.* The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

  Here, TFO Rodriguez stopped Gonsalez's black Acura after observing the vehicle "following too closely on [a] tractor-trailer," a violation of N.M. Stat. Ann. § 66-7-318(A). Doc. 102, 15:23–16:5; Ex. 1, 0:00–0:30, 1:25. This provision states that, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard

5

for the speed of such vehicles and the traffic upon and the condition of the highway." N.M Stat. Ann. § 66-7-318(A). The statute does not define what distance is reasonable and prudent or define the conditions that affect such determinations. TFO Rodriguez testified that, based on his training and experience, it is reasonable and prudent for a driver to maintain approximately three car lengths between his vehicle and another when travelling at highway speeds to allow enough time to react to sudden, unpredictable events. Doc. 102, 16:25–18:20. The Court is ill-suited to second-guess this exercise of discretion. As soon as he observed the Acura following at an unreasonable distance (within three car lengths), TFO Rodriguez made the decision to perform a traffic stop. Doc. 102, 19:11–19:20. The initial traffic stop was thus justified because TFO Rodriguez observed a traffic violation. *See Botero-Ospina*, 71 F.3d at 787.

In response to this seemingly straightforward application of Fourth Amendment law, Defendants first argue that TFO Rodriguez lacked reasonable suspicion to justify the initial traffic stop because, in their view, the dashcam footage does not show the Acura following too closely. *See* Doc. 70 at 9–10; Doc. 71 at 3–8; Doc. 73 at 2–3. But the Court's conclusion does not turn on whether Gonsalez in fact maintained a three car-length distance from the trailer—or, put differently, whether TFO Rodriguez's belief that the Acura was following the trailer too closely was mistaken—because "[a]n officer's objectively reasonable mistake of fact may support the reasonable suspicion or probable cause necessary to justify a traffic stop." *Winder*, 557 F.3d at 1134. Instead, the Court is concerned with whether TFO Rodriguez had a "reasonable articulable suspicion that a particular motorist ha[d] violated any of the traffic . . . regulations of the jurisdiction." *See Winder*, 557 F.3d at 1134. And here, after reviewing the dashcam footage, the Court finds that TFO Rodriguez's observation that Gonsalez was following the truck trailer too closely was, at most, a reasonable mistake.

6

Defendants next attempt to undermine the reasonableness of the stop by suggesting that TFO Rodriguez was on a fishing expedition and "had no intention of enforcing the traffic law" because he "has issued over 750 warnings" without issuing a "single citation." *See* Doc. 70 at 10. But this fact, even if true, does not affect the Court's analysis because "[i]t is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.'" *Botero-Ospina*, 71 F.3d at 787 (citation omitted). "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.* The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). And here, TFO Rodriguez had a reasonable, articulable suspicion that the driver of the Acura violated a traffic law by following another vehicle too closely.

B. <u>The traffic stop remained reasonably related in scope to the mission of the stop</u>.

The traffic stop also remained "reasonably related in scope to the mission of the stop itself." *Cates*, 868 F.3d at 1152 (citation modified). Once an officer conducts a traffic stop, "[t]he temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But this is not without limit: a traffic stop must "last no longer than is necessary to effectuate the purposes of the stop." *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994). "A traffic stop becomes unlawful . . . 'when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (*i.e.*, adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion.'" *Cates*, 73 F.4th at 805 (citing *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022); *see also Rodriguez*, 575 U.S. at 354–55.

7

"Even *de minimis* delays by unrelated inquiries violate the Fourth Amendment." *Cates*, 73 F.4th at 805 (citing *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020)).

Prior to issuing the warning ticket, TFO Rodriguez did not divert from the traffic-based mission of the stop. An officer's "mission" during a routine traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *See Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354). This includes "steps necessary to issue a ticket or warning, and 'ordinary inquiries incident to the traffic stop,' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Cates*, 73 F.4th at 805. "Officers may not 'divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes.'" *Id*. (citing *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020)); *see also Dawson*, 90 F.4th at 1291. However, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 354 ("Authority for the seizure [ends] when tasks tied to the traffic infraction are—or reasonably should have been—completed."). The focus remains on the "reasonableness of [a] traffic stop in light of both the length of the detention and the manner in which it was carried out." *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007); *see generally Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.") (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

TFO Rodriguez did not expand the scope of the initial traffic stop by inspecting the doorjamb VIN. VIN inspections are generally reasonable, and require no additional justification, because it is an ordinary inquiry incident to the traffic stop. *See New York v. Class*, 475 U.S. 106,

115, 118–19 (1986) ("[A] demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop."); *United States v. Ramos*, 723 F. App'x 632, 636–37 (10th Cir. 2018) (unpublished). In other words, reasonable suspicion that a separate crime was committed (for example, that the vehicle was stolen) is not required to inspect a VIN. *See Class*, 475 U.S. at 114, 118 ("Neither [the VIN inside the doorjamb nor atop the dashboard are] subject to a reasonable expectation of privacy.") An officer can inspect the doorjamb VIN after inspecting the dashboard VIN as long as "the officer remains physically outside the car." *See United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006). Here, the bodycam footage clearly shows that TFO Rodriguez remained physically outside the car while inspecting the doorjamb VIN. *See* Ex. 2, 5:30–6:30.

TFO Rodriguez's questions to the vehicle's driver or passengers also did not unreasonably prolong the stop. During a routine traffic stop, an officer can "legitimately ask questions relating to the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving, regardless of [the officer's] underlying motivation." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *see also United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *United States v.* Moore, 795 F.3d 1224, 1228–29 (10th Cir. 2015); *United States v. Jackson*, 235 F. App'x 707, 710 (10th Cir. 2007) ("Our precedent explicitly and repeatedly affirms the right of an officer to question both the driver and her passenger as part of a routine traffic stop."). "Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *United States v. Simpson*, 609 F.3d 1140, 1146 n. 1 (10th Cir. 2010) (citing *Wilson v. Sirmons*, 536 F.3d 1064, 1110 (10th Cir. 2008)); *see also United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) ("Even if [writing the

9

warning ticket] might have been performed slightly faster had [the officer] not been asking questions, the time involved was not 'beyond the time reasonably required to complete that task.'"); *Valenzuela*, 494 F.3d at 890 ("That [the officer] did not ask the question while actively processing [the defendant's] traffic infraction does not render [the defendant's] momentary detention unreasonable."); *United States v. Cortez*, 965 F.3d 827, 838–39 (10th Cir. 2020) (explaining that an officer can inquire into the identity of a vehicle's passengers and their travel plans, including where they are going and for how long, even absent reasonable suspicion that the passenger has committed a crime because such questions are "negligibly burdensome" and are "directed at ensuring officer safety"). Here, TFO Rodriguez's questioning, which pertained to travel plans and identification and lasted only a couple minutes, was plainly permissible and did not unreasonably prolong the stop. Ex. 2, 5:20–6:25.

### C. TFO Rodriguez lawfully expanded the scope of the initial traffic stop after issuing a written warning.

As established *supra* section B, TFO Rodriguez did not expand the scope of the initial traffic stop prior to issuing a written warning. The Court further finds that, after TFO Rodriguez issued a written warning to Gonsalez, he lawfully expanded the scope of the traffic stop. To detain a driver and his passengers beyond the scope and temporal limits of the initial traffic stop, the government must demonstrate that "the officer has an objectively reasonable and articulable suspicion that [further] illegal activity has occurred or is occurring" or that the "traffic stop has become a consensual encounter." *Caro*, 248 F.3d at 1244; *see also Sandoval*, 29 F.3d at 540.

TFO Rodriguez lawfully questioned Gonsalez after completing the traffic warning. When a driver voluntarily consents to an officer's additional questioning, "there is no seizure, and hence the Fourth Amendment's strictures are not implicated." *Sandoval*, 29 F.3d at 540. "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the

license and registration and asks questions without further constraining the driver by an overbearing show of authority." *West*, 219 F.3d at 1176; *see also United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005). "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *West*, 219 F.3d at 1176 (citing *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996)). "Whether an encounter can be deemed consensual depends on 'whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'" *Id.* (citing *Hernandez*, 93 F.3d at 1498). "An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave." *Id.* at 1176–77. "[A]n unlawful detention occurs only when the driver has an 'objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.'" *Id.* at 1177 (citing *Hernandez*, 93 F.3d at 1498). Defendants do not dispute that Gonsalez voluntarily consented to additional questioning; after returning his documentation and handing over the warning ticket, TFO Rodriguez asked Gonsalez if he would be willing to answer additional questions about his travel, to which Gonsalez agreed. Ex. 2, 9:51. Accordingly, Gonsalez's responses to TFO Rodriguez's questions could be used to inform his suspicions.

After issuing the warning ticket and again questioning Gonsalez, TFO Rodriguez had an objectively reasonable suspicion that expanding the traffic stop would lead to the discovery of further evidence of illegality. Reasonable suspicion exists if an officer has "a particularized and objective basis for suspecting the [defendant] of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quotations omitted). "The existence of objectively reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality of the circumstances.'" *Simpson*, 609 F.3d at 1146 (citing *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)).

11

Though the "government bears the burden of demonstrating the reasonableness of the suspicion," it "is not an onerous standard." *United States v. Cortez*, 965 F.3d 827, 834 (10th Cir. 2020). "Reasonable suspicion requires only that the officer have 'a moderate chance' of finding evidence of illegality on further investigation." *United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023) (citation omitted); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009); *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) ("[The] level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." (citation and internal quotations omitted)). "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (Gorsuch, J.) (citations and internal quotations omitted). Indeed, "[a] factor may raise objectively reasonable suspicions 'even if it is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'" *Simpson*, 609 F.3d at 1146 (citing *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 9 (1989))). Courts give "deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances . . . ." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

Several facts were present that supported TFO Rodriguez's reasonable suspicion that Defendants were engaged in criminal activity. Unlikely or inconsistent travel plans can contribute to reasonable suspicion. *See Cortez*, 965 F.3d at 835–37 (explaining that unlikely or inconsistent travel plans can contribute to probable cause). When asking about Defendants' travel plans, TFO Rodriguez identified several inconsistencies between Gonsalez's and Garcia's stories. In response to TFO Rodriguez's question to the passengers about their travel plans, Garcia stated that they

were travelling to visit Gonsalez's ailing father. Ex. 2, 5:35. Later, while printing the warning ticket, TFO Rodriguez asked Gonsalez about his father and whether he was in good health (to identify an inconsistency with Garcia's statement that the father was ailing); Gonzales responded that his father was a truck driver and was "doing pretty good for himself" without describing any acute health problems or ailments. Ex. 2, 7:40–8:04. Gonsalez also stated that he was driving from California to Mission, *Texas*, and that he intended to stay for over a week, Ex. 2, 3:00–3:20, while Garcia stated that they were going to Mission, *New Mexico*, and that they did not know when they would return. Ex. 2, 5:47–5:55. He also found it suspicious that the passengers decided to travel without luggage, licenses, or any personal belonging. Doc. 102, 36:10–37:6; Ex. 2, 12:20–12:30. Moreover, TFO Rodriguez found the geography and context of the stop suspicious. *See Cortez*, 965 F.3d at 835 ("[T]he geography and context of the stop generated suspicion" because the officer testified that the road was "unique in that it is the only route directly from the border that doesn't have Border Patrol checkpoints." (citation modified)). After Gonsalez consented to additional questioning, TFO Rodriguez asked why Gonsalez why he did not take I-10 and observed that their current route was much longer. Ex. 2, 10:53–11:00. This made him suspicious because, in his training and experience, drug traffickers often avoid taking routes where there are border patrol checkpoints; I-10 (the most direct route) has several checkpoints while I-40 (the route they were taking) had none. Doc. 102, 26:19–27:7. He also noted that drug traffickers moving through southwestern states usually travel east. Doc. 102, 27:9–27:22. Finally, TFO Rodriguez smelled marijuana coming from inside the car after he asked the occupants to roll down their windows. Doc. 102, 23:17–23:20; *see United States v. Torres*, 987 F.3d 893, 903 (10th Cir. 2021) (explaining that, after the officer "smelled burnt marijuana," he "had reasonable suspicion to believe that [the driver] or his passenger was violating the federal drug laws' prohibition against the possession of

13

marijuana"). Considered together, these facts support reasonable suspicion to extend the traffic stop after issuing the warning ticket.

## II. TFO Rodriguez's warrantless search of the vehicle did not violate the Fourth Amendment.

The Court finds that TFO Rodriguez's warrantless search of the vehicle was lawful. Warrantless searches are "per se unreasonable under the Fourth Amendment . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "Under the automobile exception to the Fourth Amendment's warrant requirement, police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023) (citing *Bradford*, 423 F.3d at 1159) (internal quotations omitted). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* (citing *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)) (internal quotations omitted). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)) (internal quotations omitted). "Once the officer's suspicions rise to the level of probable cause, they are empowered to search 'the entire vehicle, including the trunk and all containers therein that might contain contraband." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (citing *Bradford*, 423 F.3d at 1160). "The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 823 (1982).

TFO Rodriguez had probable cause to search the trunk of the vehicle. As discussed *supra* section I.C, TFO Rodriguez identified inconsistent and unlikely travel plans. *See Cortez*, 965 F.3d

14

at 935–37 (explaining that unlikely or inconsistent travel plans can contribute to probable cause); Ex. 2, 16:15–16:47 (Defendant Zermeno confirming that he did not bring any luggage). The presence of marijuana in the vehicle also weighs heavily in the probable cause analysis. *See Phillips*, 71 F.4th at 823 ("An officer's detection of the smell of drugs in a car is entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause." (citing *West*, 219 F.3d at 1178) (citation modified)). This remains the case even though recreational marijuana is legal in New Mexico because its possession remains illegal under federal law and continues to be heavily regulated statewide. *See Torres*, 987 F.3d at 903 (concluding that "the police had reasonable suspicion to believe that [the defendant] or his passenger was violating the federal drug laws' prohibition against the possession of marijuana" when "police approached [the defendant's] vehicle . . . [and] smelled burnt marijuana"); 21 C.F.R. § 1308.11(d)(23) (1974) (classifying marijuana as a Schedule I controlled substance); 21 U.S.C. § 844(a) ("It shall be unlawful for any person knowingly or intentionally to possess a controlled substance . . . ."); N.M. Code R. § 16.8.1.9 (2025) ("Persons . . . selling, purchasing, or otherwise receiving cannabis . . . may be subject to federal sanctions for what may otherwise be considered authorized conduct in the State of New Mexico . . . ."); N.M. Stat. Ann. §§ 26-2C-1–26-2C-43 (2024) (cannabis regulations). "The odor of burnt marijuana in the passenger compartment of a vehicle does not, standing alone, establish probable cause to search the trunk of the vehicle." *Bradford*, 423 F.3d at 1160 (citing *United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993)). But "an officer obtains probable cause to search the trunk of a vehicle if he smells marijuana in the passenger compartment *and* finds corroborating evidence of contraband." *Id.* (emphasis added). The fact that the amount of marijuana found is consistent with, or that a defendant admitted to, personal use is still sufficient to support a finding of probable cause to search the whole vehicle,

15

not just the passenger compartment, for greater quantities of contraband. *See United States v. Loucks*, 806 F.2d 208, 211 (10th Cir. 1986) (discussing *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986)); *Parker*, 72 F.3d at 1451.

In this case, TFO Rodriguez smelled marijuana when he initially approached the vehicle, and evidence of marijuana was corroborated by Defendants admitting to having marijuana in the car and another officer confirming that he saw marijuana in the backseat in plain view. Doc. 102, 36:4–36:10, 40:13–40:22, 55:4–55:10; Ex. 2, 11:20–11:40, 17:10–17:20. Accordingly, TFO Rodriguez had probable cause to search areas of the vehicle which could hold greater quantities of contraband, including the trunk of the vehicle and containers therein. *See Loucks*, 806 F.2d at 210–11; *Bradford*, 423 F.3d at 1160.

### III. Defendants Zermeno and Garcia were lawfully detained and arrested.

Defendants Zermeno and Garcia, the passengers in the vehicle, were lawfully detained during the traffic stop. Ex. 2, 12:58–18:25. "[A]n officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Brendlin v. California*, 551 U.S. 249, 258 (2007); *see also Maryland v. Wilson*, 519 U.S. 408, 415–16 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977) (per curiam) (holding that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle"). This recognizes that, "[e]ven for routine traffic violations, traffic stops are 'fraught with danger to police officers.'" *Barnes v. Felix*, 145 S. Ct. 1353, 1360 (2025) (Kavanaugh, J. concurring) (citing *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). In this case, TFO Rodriguez removed and separated the passengers to prevent them from fleeing or attacking. Doc. 102, 41:2–41:12.

16

Defendants Zermeno's and Garcia's arrests did not violate the Fourth Amendment. "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citations omitted). Probable cause means that an officer must have "a reasonable ground for belief of guilt, . . . and that belief must be particularized with respect to the person to be search or seized." *Id.* at 371 (citations and internal quotations omitted); *see also United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) ("Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge . . . are sufficient themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." (citation and internal quotations omitted)). "Probable cause to arrest does not require facts sufficient to establish guilt, but [it] does require more than mere suspicion." *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998) (citation omitted).

Once TFO Rodriguez searched the vehicle and discovered a large amount of methamphetamine, he had probable cause to arrest all the vehicle's occupants, including Defendants Zermeno and Garcia. In general, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979) (holding that officers did not have probable cause to search a tavern patron without facts connecting him to illegal activity). But "where there are facts in addition to one's association with someone engaged in criminal activity, . . . [courts] must consider whether the 'totality of the circumstances' known at the time of the arrest established probable cause." *Vazquez-Pulido*, 155 F.3d at 1216–17. One set of facts where courts have repeatedly found probable cause to arrest closely situated individuals is where officers discover large amounts of narcotics in a small vehicle. *See Pringle*, 540 U.S. at 373–74 (concluding that an officer had

probable cause to arrest a passenger riding in a "relatively small automobile" where drugs were discovered because "it was reasonable for the officer to infer a common enterprise among the three men"); *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999) ("[A] car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver . . . ."); *Torres*, 987 F.3d at 903 (explaining that "[e]ven though the officers directed their questions to the passenger, the resulting suspicions could reasonably extend to [the driver]," and vice versa, because "a passenger will often be engaged in a common enterprise with the driver." (citing *United States v. Dennison*, 410 F.3d 1203, 1213 (10th Cir. 2005) (citation modified)).

This case is nearly identical to *Pringle* and its progeny: A driver and two passengers were stopped in a relatively small vehicle for a traffic violation and a quantity of drugs indicative of drug trafficking was subsequently discovered. Doc. 102, 42:11–43:18, 45:3–45:4; *see Pringle*, 540 U.S. at 373. Moreover, while Gonsalez claimed ownership over luggage in the trunk, no one claimed ownership over the plastic garbage bag that contained the methamphetamine or the methamphetamine itself. It was therefore reasonable for TFO Rodriguez to infer that both the driver and passengers—considering the small size of the vehicle and apparent familiarity of its occupants, the large amount of methamphetamine found, the inconsistent travel plans between the driver and passengers (which suggests that their stories were fabricated), and the other suspicious circumstances discussed at length in the sections above—were engaged in a common criminal scheme.

## CONCLUSION

The Court finds that the traffic stop, vehicle search, and arrests did not violate the Fourth Amendment. Accordingly, Defendants' motions to suppress evidence seized during the traffic stop, Docs. 70, 71, 72, are denied.

**It is SO ORDERED**.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE